AO 91 (Rev. 11/11) Criminal Complaint          AUSA Alejandro G. Ortega (312) 353-4129

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | CASE NUMBER: 25 CR 163 |
|---|---|
| v. | |
| ARNOLDO PEREZ | |

**FILED**
3/21/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about March 19, 2025, at Markham, in the Northern District of Illinois, Eastern Division, the defendant, ARNOLDO PEREZ violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 841(a)(1) | knowingly distributed 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Andres Lizarzaburo*
ANDRES LIZARZABURO
Special Agent, Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: March 21, 2025

*Judge's signature*

City and state: Chicago, Illinois          YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, ANDRES LIZARZABURO, being duly sworn, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration. I have been so employed since approximately April 2022. I am currently assigned to the Chicago Field Division Strike Force Group 3 ("SF3"). Previously, from April 2016 until my employment with DEA, I was a Police Officer with the City of Chicago, Illinois. ("CPD"). I received approximately seventeen weeks of law enforcement training at the DEA Academy in Quantico, Virginia and graduated from the DEA academy. For two years I participated in the arrests and investigations of offenses relating to narcotics offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that Arnoldo PEREZ has violated 21 U.S.C. 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging PEREZ with distribution of narcotics, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, audio and video recordings, physical surveillance, and preserved text messages and audio recordings.

## FACTS IN SUPPORT OF PROBABLE CAUSE

### *Background*

4. Since approximately January 2025, law enforcement, including DEA, has been investigating the Christopher Callahan Drug Trafficking Organization ("DTO"), which operates in and the areas around Chicago, Oak Lawn, Alsip, and Markham, Illinois. During the investigation, law enforcement identified two Illinois-based individuals named Artemio Perez-Lopez, and Arnoldo PEREZ, who are believed to be narcotics sources of supply for the Callahan DTO operating on behalf of an unidentified Mexico-based narcotics broker.

5. As set forth in more detail below, on or about March 19, 2025, PEREZ distributed approximately 2.71 kilograms of cocaine to an undercover law enforcement officer (the "UC") in an audio and video recorded controlled undercover transaction at a ranch located in Markham, Illinois (the "Ranch"). The following day, on or about March 20, 2025, law enforcement executed a search warrant at the Ranch, and recovered approximately 1.5 additional kilograms of cocaine and bulk cash from a trailer that PEREZ admitted was his.

### *On or about March 17, 2025, CALLAHAN Distributes Approximately 2.62 Kilograms of Cocaine to the UC*

6. As described below, on or about March 16 and 17, 2025, the UC communicated with an individual named Christopher Callahan about receiving narcotics. Thereafter Callahan distributed approximately 2.62 kilograms of cocaine to the UC in an audio and video recorded transaction.

2

7. According to the UC and preserved WhatsApp text message and audio conversations, on or about March 16, 2025, at approximately 7:51 p.m., the UC sent a text message to a user with telephone number (\*\*\*) \*\*\*-7194 ("Subject Phone 2"),[1] which is a cellular phone that law enforcement has determined is used by Callahan.[2] The text message read, "Amigo im out work. Where meet?"[3] The purpose of the UC's communication was to solicit narcotics from Callahan. Callahan responded that he finished work at around 7:00 p.m. The UC and Callahan then agreed to meet at a location Callahan described as "a placed called cfx in Alsip . . . It's a gym."

8. Later that day, at approximately 3:08 p.m., the UC and Callahan, using Subject Phone 2, had a phone call in which the UC asked Callahan if Callahan could meet earlier, in approximately one hour, and Callahan said he could not. At

---

[1] Subscriber information does not reflect a subscriber for Subject Phone 2.

[2] CALLAHAN has been identified as the user of Subject Phone 2 as follows: during the course of this investigation, as described in this affidavit, the UC communicated with the user of Subject Phone 2 about a narcotics transaction which occurred on or about March 17, 2025. During that interaction, the UC met and spoke with CALLAHAN and confirmed that CALLAHAN's voice is the voice heard on Subject Phone 2 during recorded conversations described elsewhere in this affidavit. Law enforcement also showed CALLAHAN's Illinois driver's license photograph from Illinois Secretary of State databases to the UC and the UC confirmed that the individual with whom he met on or about March 17, 2025 was CALLAHAN.

[3] The communications summarized in this application do not include references to all topics covered during the course of the conversation. The summaries also do not include reference to all statements made by the speakers on topics described. All quotations are based on preliminary transcriptions of the conversations and the times listed are approximate. At various points, I have included interpretations of words and phrases. These interpretations are based on law enforcement officers' understanding of the conversations, which is based on the content and context of the conversations, their knowledge of the investigation as a whole, their experience and training, and the experience and training of other law enforcement officers in this investigation. Some of the conversations are in the Spanish language. For those communications, I have relied on draft, not final, Spanish-to-English translations of the conversations done by law enforcement officers and/or interpreters contracted by law enforcement officers.

approximately 5:07 p.m., Callahan texted the UC and asked, "what model car[?]" The UC replied, "Honda." The UC and Callahan exchanged more text message to coordinate a meet up point, and at approximately 6:48 p.m., Callahan directed the UC to "park by the smoothie shop", which is a business located on the 4800 block of West 111th Street in Alsip, Illinois (the "smoothie shop").

9. At approximately 6:30 p.m., law enforcement established physical surveillance on Callahan's residence, located at **** South 58th Court, Oak Lawn, Illinois (the "Callahan Residence").[4] According to surveillance, Callahan departed the Callahan's Residence at approximately 7:06 p.m. driving in a blue Dodge Ram with Illinois license plate number ****301-B (the "Dodge Ram"). According to vehicle registration records and law enforcement databases, the Dodge Ram is registered to Callahan. Callahan then drove to a gas station located at the 5000 block of W. 111th Street, in Alsip, went into the gas station for approximately two minutes, then exited and got back into the Dodge Ram and drove slowly around the neighborhood, stopping at intersections for long periods of time. Based on my training and experience, I know that this is a common countersurveillance tactic used by individuals involved in illicit activity because they are attempting to evade law enforcement.

10. At approximately 7:25 p.m., Callahan drove to a residence located at ***** South Avon in Alsip, Illinois, and parked in the driveway. An unknown individual then exited the rear of the residence, walked to the passenger side of the

---

[4] According to information from the Illinois Secretary of State, the Callahan Residence is listed as the residential address on Callahan's Illinois driver's license.

4

Dodge Ram, and placed a white reusable-style grocery bag with blue trim on the front passenger seat. Callahan then drove away toward the smoothie shop where Callahan parked next to the UC's vehicle (the "UCV"), got out of his car, and entered the passenger side of the UCV. According to the UC and audio and video recordings, Callahan gave a bag to the UC, and the UC asked Callahan how many kilograms [of cocaine] were in the bag. Callahan responded that there were two, and that they were the last two he had. Callahan then exited the UCV, got back into the Dodge Ram, and drove away. The bag contained two brick-shaped objects wrapped in green duct tape. According to field tests, the contents of the brick-shaped objects tested presumptively positive for the presence of cocaine and weighed approximately 2.62 kilograms.

11. At approximately 8:02 p.m., the UC had a recorded WhatsApp audio conversation with a user of Mexican telephone number 52-******6979 ("Subject Phone 1"),[5] who law enforcement has determined is an unidentified Mexico-based narcotics broker ("Individual A").[6] According to the UC and audio recordings, in summary, during the conversation, the UC told Individual A that the UC had successfully received the two kilograms of cocaine from Callahan, but told Individual A that he (the UC) had been expecting four kilograms, instead of two. Individual A told the UC that the two kilograms were "what was left over" and asked, "how many did you need?" The UC replied, "I thought we had agreed on four cars [kilograms of

---

[5] Subscriber information does not reflect a subscriber for Subject Phone 1.

[6] Text and audio communications with Subject Phone 1 described in this affidavit were in Spanish. All summaries and quoted passages in this affidavit are draft translations that have been reviewed by a Spanish-speaking law enforcement agent.

5

narcotics]." Individual A replied, "like I mentioned that was what he had left but don't worry tomorrow I'll have more for you." The UC and Individual A agreed that Individual A would ensure the UC received two additional kilograms in the next day or two, and they agreed to be in communication the following day.

### *On or about March 19, 2025, Arnoldo PEREZ Distributes Approximately 2.714 Kilograms of Cocaine to the UC at the Ranch*

12. According to the UC and preserved communications, on or about March 19, 2025, at approximately 11:42 a.m., Individual A, using Subject Phone 1, texted the UC and told the UC that he was ready to distribute the additional narcotics to the UC, and instructed the UC to have the UC's "friend" "pick up the two pieces [kilograms of cocaine] at 5:30 [p.m.]" and stated "I'll send you the address you have to be at 5:30 [p.m.]." At approximately 2:22 p.m., Individual A texted the UC with the address "3101 W. 153rd St, Markham IL" (the Ranch). Individual A said, "It's in there it's a ranch, when you get there you let me know, they will come out and give you the 2 pieces [kilograms of cocaine]." Later, at approximately 4:23 p.m., Individual A called the UC and said, "Don't forget to be in the ranch right now at 5:30 [p.m.] to pick up the other ones [kilograms]." The UC replied, "Yes I already let them know that I was on my way." Individual A stated, "When you arrive in the ranch, call me, so I can let them know and they'll come out to give them [kilograms] to you." The UC then drove to the Ranch in the UCV.

13. At approximately 5:25 p.m., law enforcement set up physical surveillance on the Ranch. At approximately 5:26 p.m., Individual A texted the UC "what kind of car are you driving?" The UC replied, "the same one sir." Individual A

6

texted, "to tell the ranch so they can know what car you are going." The UC replied, "black car 4 doors, Honda." At approximately 5:29 p.m., the UC texted Individual A, "I'm here." Individual A replied, "Ok, they'll come out and give them to you."

14. According to the UC and audio and video recordings, at approximately 5:30 p.m., the UC arrived and parked inside the garage of the Ranch. A Latino male, later identified as Artemio Perez-Lopez,[7] approached the UCV and spoke with the UC in Spanish. According to the UC and audio and video recordings, in summary, the UC told Perez-Lopez that he was there to collect the two kilograms of cocaine, and Perez-Lopez then said he would call his brother. Shortly thereafter, a second Latino male, later identified as Arnoldo PEREZ,[8] exited a chicken coop inside the Ranch carrying a white plastic grocery bag which was open, with the contents visible. PEREZ approached the UCV and handed the open bag to the UC, and the UC drove away. The bag contained two brick-shaped objects wrapped in green duct tape identical to the packaging material used to wrap the suspect cocaine that the UC had received from Callahan on March 17, 2025. According to field tests, the contents of

---

[7] Perez-Lopez has been identified as follows: following the controlled transaction on or about March 19, 2025, law enforcement showed the UC a photograph of Perez-Lopez from an Illinois Secretary of State database and the UC confirmed that the individual with whom he initially met at the Ranch was Perez-Lopez.

[8] PEREZ has been identified as follows: following the controlled transaction on or about March 19, 2025, law enforcement showed the UC a photograph of PEREZ from an Illinois Secretary of State database and the UC confirmed that the individual from whom he received the cocaine at the Ranch was PEREZ. Additionally, as described in this affidavit, law enforcement arrested PEREZ on March 20, 2025, and thereafter interviewed with him and confirmed his identity.

the bag tested presumptively positive for the presence of cocaine and weighed approximately 2.714 kilograms.

### *On or About March 20, 2025, Law Enforcement Arrests PEREZ and Recovers Approximately 1.5 Kilograms of Cocaine and Bulk Cash*

15. On or about March 20, 2025, law enforcement obtained a search warrant for the Ranch. No. 25 M 176 (N.D. Ill., Kim, M.J.).

16. According to law enforcement who executed the search, on or about March 20, 2025, at approximately 2:00 p.m., officers entered the Ranch and conducted a K9 sweep of the premises. The K9 alerted positive to the presence of narcotics. With the assistance of the K9, law enforcement officers located a trailer in the rear of the residence.

17. Inside the trailer, law enforcement observed three containers with an oily residue and odor consistent with the packaging material on the brick-shaped packages of cocaine recovered on or about March 17 and 19, 2025. On top of a cabinet in the trailer, law enforcement obtained two additional brick-shaped objects wrapped in plastic, each of which contained a white powdery substance—suspected cocaine. The weight of both objects combined was roughly 1.5 kilograms. Law enforcement also recovered a large bundle of U.S. currency, which was, based on my training and experience, bundled and packaged in a manner consistent with the manner in which drug traffickers typically bundle large quantities of cash.[9] Finally, law enforcement

---

[9] As of the date of this affidavit, law enforcement has not field tested or officially weighed the suspected cocaine or counted the currency seized on or about March 20, 2025.

recovered a pistol and a shotgun from another trailer that were hidden behind a screwed panel in a closet.

18. During the execution of the search warrant, PEREZ arrived at the premises and approached law enforcement. Law enforcement then detained PEREZ and advised him of his *Miranda* rights. PEREZ acknowledged his rights and told law enforcement that the trailer in which the narcotics were recovered was his trailer but denied knowledge of the suspected cocaine. Thereafter, PEREZ invoked his *Miranda* rights and questioning ceased.

FURTHER AFFIANT SAYETH NOT.

*Andres Lizarzaburo*
ANDRES LIZARZABURO
Special Agent, Drug Enforcement Administration

SWORN TO AND AFFIRMED by telephone March 21, 2025.

Honorable YOUNG B. KIM
United States Magistrate Judge

9